**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

DONALD LEE BRADLEY,

               Petitioner,

v.                                           Case No. 3:10-cv-1078-J-32JRK

SEC'Y, FLA. DEP'T OF CORR., et al.,

               Respondents.

_____

## ORDER

### I. Status

Petitioner Donald Lee Bradley is a death-sentenced inmate of the Florida penal system who is represented by counsel.[1]  He is proceeding in this action on a Petition with Leave to Amend for Writ of Habeas Corpus by a Person in State Custody, Under 28 U.S.C. § 2254 (Doc. #1) (hereinafter Petition).[2]  Petitioner challenges his 1998 state court (Clay County) judgment of conviction for first degree murder, burglary with a dangerous weapon and conspiracy to commit first degree murder.

The Petition raises the following grounds for relief: (1) Petitioner received ineffective assistance of trial counsel because counsel failed to present Petitioner's mental health

_____

[1] Petitioner is represented by Richard R. Kuritz, Esquire.

[2] Petitioner does not request leave to amend in the body of the Petition, nor has he submitted a motion requesting leave to amend as of the date of this Order.

records and evidence of Petitioner's chaotic childhood and dysfunctional family life during the penalty phase and also failed to properly investigate and use duct tape evidence during the guilt phase of trial; (2) the trial court erred in finding there was sufficient evidence to support the "cold, calculated and premeditated" (hereinafter CCP), "heinous, atrocious and cruel" (hereinafter HAC) and "murder for pecuniary gain" aggravating factors; (3) the trial court erred in finding there was sufficient evidence to support the charge of conspiracy to commit first degree murder; (4) the jury's limited consideration of mitigating circumstances violated Petitioner's rights under the United States Constitution to a reliable penalty hearing; and (5) Petitioner's sentence of death is disproportionate.

Respondents have responded to the Petition. See Response to Order to Show Cause Why a Writ of Habeas Corpus Should Not Be Granted (Doc. #7) (hereinafter Response).[3] Petitioner has replied. See Petitioner's Reply to State's Response to Show Cause Why a Writ of Habeas Corpus Should Not Be Granted (Doc. #13) (hereinafter Reply).  This case is now ripe for review.[4]

———————————————

[3] The Court hereinafter refers to the tabbed exhibits submitted with Respondents' Habeas Corpus Checklist (Doc. #8) as "Ex."  Unless otherwise noted, the Court will cite the page number imprinted on the bottom center of each page of the pertinent exhibit, or if there is no page number on the bottom center of the page, the Court will cite the page number imprinted on the upper right corner of each page of the exhibit.

[4] Respondents argue, and this Court agrees, that the Petition was not timely filed within the one-year limitation period for filing federal habeas petitions.  See Response at 23-27. Petitioner has neither alleged nor shown that equitable tolling or actual innocence should apply so that the Court may reach the merits of his claims.  However, Respondents assert that the Court should proceed to evaluate the merits of the Petition rather than engaging in potentially prolonged proceedings to determine whether equitable tolling or actual innocence is applicable in this case.  See id. at 27.  Petitioner agrees.  See Reply at 2-3.  Thus, this Court will proceed to address the grounds raised in the Petition.

## II. Procedural History

In the opinion affirming Petitioner's judgment of conviction on direct appeal, the Florida Supreme Court summarized the trial proceedings as follows:

TRIAL

Bradley was convicted of murder, burglary, and conspiracy, all arising out of the murder of Jack Jones, which was committed at the request of the victim's wife, Linda Jones. Testimony at trial indicated that Mrs. Jones became distraught and incensed when she learned that Mr. Jones had a sexual affair with Carrie Davis, a teenage girl the Joneses had befriended and taken into their home. When unsuccessful in her numerous attempts to break up the affair, and, upon learning of Mr. Jones's intent to marry the girl, Mrs. Jones sought Bradley's assistance, first to physically intimidate the teenage girl and later to assault and batter Mr. Jones.

Bradley had a landscaping business and Mrs. Jones prepared his tax returns. On October 31, 1995, at the request of Mrs. Jones, Bradley took two of his employees, Brian McWhite and Patrick McWhite, teenage brothers, and Michael Clark, a sometime employee, and set out to retrieve a diamond ring Mr. Jones had given his teenage lover. Once they arrived at the teenager's apartment, however, she refused to open the door. Frustrated, Bradley directed the employees to break the teenager's car windows.

Mrs. Jones then decided to have Bradley assault Mr. Jones, and Bradley and Mrs. Jones agreed on a plan to make the assault look like a burglary of the Joneses' house. On November 7, 1995, at about 8 p.m., Bradley picked up the McWhite brothers and, while at the McWhite brothers' house, Bradley directed Patrick McWhite to pick up a large "zulu war stick" to use on Mr. Jones. The McWhite brothers both testified they agreed to help beat Mr. Jones for a hundred dollars each, but that Bradley never mentioned killing Jones. They also testified to numerous telephone conversations Bradley had with Mrs. Jones immediately before and after the home invasion.

3

As planned, the McWhite brothers, gloved and ski-masked, entered the Joneses' home through the front door, while Bradley entered through a side door in order to obtain a gun Mrs. Jones told him was kept by Mr. Jones in the kitchen. Mr. and Mrs. Jones were watching television, and when Mr. Jones noticed the McWhite brothers, he immediately told them to get out of his home. When they refused, he started fighting with them.

Thereafter, as described by the McWhite brothers, Bradley administered a brutal and methodical beating to Mr. Jones with the "war stick" and the gun. During the beating, Bradley and one of the McWhite brothers duct-taped Mr. Jones's hands and feet and dragged him to another room, and Bradley continued the beating. At one point, Bradley attempted to shoot Mr. Jones in the head, but the gun malfunctioned. Patrick McWhite testified that Mr. Jones continually begged Bradley to stop the beating, while Brian testified that he too asked Bradley to stop, but Bradley refused. Meanwhile, Mrs. Jones calmly watched the whole episode, and Bradley later duct-taped her hands to make it look like she was a victim. The "burglars" also removed some items of personal property from the house. After they left the house Bradley told the McWhite brothers that he thought he killed Jones. Indeed, Jones died as a result of the beating.

After Mrs. Jones called 911 and reported the episode as a burglary and robbery, Brian McWhite's fingerprints were found, leading to the arrest of the McWhite brothers who later confessed to their participation in the events of that night. A neighbor of the Joneses also reported seeing Bradley's van leave the Joneses' home at the time of the alleged burglary. Bradley later admitted that he had made phone calls to Mrs. Jones on the night of the murder but only about picking up some tax documents from under Mrs. Jones's front door and that he went to the Joneses' home, but left immediately when he did not find the tax documents.

Janice Cole, a long-time friend of Mrs. Jones, testified that a few days before the murder, Mrs. Jones had told her of her desire to take a gun and kill her husband and that she, not some other woman, was entitled to the proceeds of Mr. Jones's life insurance policies worth some $500,000. Brian McWhite

also testified that Bradley burned the clothing and the "war stick" involved in Jones's beating, and Bradley told him that he was expecting a payoff of between $100,000 to $200,000 from Mrs. Jones after she received the life insurance proceeds.

The McWhite brothers, Bradley, and Mrs. Jones were all charged with the murder. Mrs. Jones was tried, convicted, and sentenced to life imprisonment for the murder. The McWhite brothers entered into a plea arrangement whereby they received ten-year sentences upon guilty pleas to third-degree murder. The plea agreement also required their testimonies in the trials of Mrs. Jones and Bradley. Bradley was convicted of first-degree murder, burglary, and conspiracy to commit murder.

## SENTENCING PHASE

At the sentencing phase proceeding, the State presented one witness, and the defense presented fourteen.FN2 For the State, Patrick McWhite testified that Mr. Jones was alive throughout the beating and continuously begged Bradley to stop.

> FN2. The witnesses presented by Bradley included Detective Waugh, Donald Lee Bradley, Sr., Julie J. Witherell (Bradley's mother), Valerie Bradley (Bradley's wife), Cynthia Lee Bradley (Bradley's sister), Cathy M. Robbins (Bradley's sister), Pamela J. Bradley (Bradley's sister), Arthur J. Kurtz (a former employer), Elizabeth Smith (a former business acquaintance), Katisha Gussman (Bradley's niece), Mark Angelo (a business acquaintance and general contractor), Eli F. Robbins (Bradley's ex-brother-in-law), Harvey G. Sowers (a fellow church member), and Dean Lohse (Bradley's orthopedic surgeon).

The trial judge told the jury of the convictions and sentences of Mrs. Jones and the McWhite brothers. The jury was also told of Mrs. Jones's convictions for two other charges of soliciting others to kill her husband. A police detective testified extensively about Mrs. Jones's solicitations of two other men to kill her husband, including proposing a fake burglary plan for the murder that was almost identical to the fake burglary carried out by Bradley during which he killed Mr. Jones. During

5

one of these solicitations Mrs. Jones asked for a silencer for a gun so she could kill herself and her husband's girlfriend.  In another, she proposed that the solicited killer kill her husband and the girlfriend.

The defense presented evidence that Bradley came from a very dysfunctional family and was subjected to extensive emotional and physical abuse.  The testimony established that Bradley's father was constantly cheating on his wife with the next-door neighbor, Nancy (no last name provided).  As a result, Mr. and Mrs. Bradley were constantly fighting as Bradley and his siblings routinely witnessed their father slapping their mother during these confrontations.  Unable to deal with the father's infidelity, the mother eventually left the house and moved into an apartment. Nancy then moved in with the father and the children.

The testimony further revealed that once Nancy moved in, Bradley and his siblings experienced nothing but sheer misery from their father and Nancy. First, the two eldest sisters, Pamela and Cynthia, had to drop out of high school in order to take care of Bradley and the two younger ones since Mr. Bradley and Nancy spent little time with them.  The only time spent with Bradley and the siblings consisted mainly of Nancy telling them how much she hated them and the daily beatings by either Nancy or Mr. Bradley upon one or all of them.  The beatings could be triggered by a host of events ranging from Nancy telling the father that one of the children was lying to the fact of any of the children drinking or eating before the father got home in the evening. Occasionally, the father would beat them on "general principles," that is, he would beat all of them to ensure that he got the right one or that they already were beaten for the following week.  Anticipating the beatings, Bradley and his siblings would cry all night, but as soon as they fell asleep, the father would wake them up and beat them.

To complement the beatings, Nancy and the father would play very odd games with the children.  For instance, Cynthia testified that Nancy would mark the milk jug and other food containers before leaving the home so she could tell if any of the children had drunk or eaten anything when she returned; if the food item went below the mark, everyone would get beaten. The father hid dirt in the house before he left and told them they

had to find it before he returned; if the dirt was still there, they would all get beaten.  Whenever their father and Nancy went out, they would put the children in their room, then place a piece of paper in the door to help them determine whether the children had left their room.  They would get a beating for opening the door for any reason, including going to the bathroom, but one of them was beaten for urinating in her room out of fear of dropping the paper off of her room's door.

The testimony also revealed that Bradley received the brunt of the abuse as Nancy and the father took it far beyond the daily beatings.  Bradley had broken his arm in some accident and could not move it for days.  Nancy, a nurse at the time, and his father refused to take him to the hospital.  Because of the pain of the broken arm, Bradley attempted to eat with his left hand but could not and ended up spilling his drink. Nancy then picked up the broken arm, slammed it down on the table and told him the arm was fine.  Bradley was finally taken to the hospital after the school threatened to contact the authorities.

In another incident, Bradley was severely suffering from appendicitis, but his father would not take him to the hospital. He eventually took him to Bradley's mother who then immediately took him to the hospital.  The hospital treated Bradley and told the mother that Bradley's appendix had ruptured and could have easily killed him.  In yet another incident, when Bradley was unable to slice some tomatoes as directed by Nancy, she took the knife out of his hand, stabbed his hand with the knife and asked him, "Now do you know how to cut tomatoes?"

Eventually, after the two older sisters had moved out of the father's home, the latter took Bradley and the two younger siblings and dropped them in front of their mother's one-bedroom apartment.  The mother took them in when she got home that evening.   Ultimately, Cathy, the eldest sibling, attempted suicide numerous times and Bradley, at the age of fifteen, started frequenting a tough crowd and committing crimes.

Nonetheless, as an adult, Bradley later developed a relationship with his father and helped his mother financially and otherwise.   Witnesses also testified to Bradley's intense commitment to his work and family.   According to former

7

co-workers and clients, Bradley was an excellent worker. Witnesses testified in great detail about how he took care of his family and was very involved in the lives of his children. On cross-examination, however, Valerie Bradley, his wife, testified that Bradley had been arrested for a battery committed upon her. Bradley also had a long history of being involved as a member of a Jehovah's Witnesses congregation and several times a week attended Bible studies. He made many friends within the congregation.

Upon hearing the above evidence, the jury recommended death by a ten-to-two vote, and, following a <u>Spencer</u> hearing[5] the trial court sentenced Bradley to death.

<u>Bradley v. State</u>, 787 So.2d 732, 734-38 (Fla. 2001) (per curiam) (several footnotes omitted);

Ex. 32.

On direct appeal, Petitioner raised the following claims:

(1) the evidence was insufficient to support Bradley's conviction for premeditated first-degree murder because there was conflicting evidence regarding his intent to kill; (2) the evidence was insufficient to support his conviction for felony-murder (burglary) because he was allowed entry into the home by one of the occupants; (3) even assuming the finding of premeditation, he is entitled to a new trial because the jury may have convicted him on a legally insufficient theory (felony murder/burglary); (4) the evidence was insufficient to prove conspiracy to commit first-degree murder; (5) the trial court erred in admitting evidence that Bradley vandalized Carrie Davis's car on October 31, 1995, where such evidence was not relevant to any material issue and served only to attack his character; (6) the trial court erred in admitting an out-of-court statement by Detective Redmond to the effect that Bradley's van had been

---

[5] <u>Spencer v. State</u>, 615 So.2d 688 (Fla. 1993) (per curiam) (holding that, prior to imposing a sentence in a capital case, the trial judge should hold a hearing to give the defendant, his counsel, and the state an opportunity to be heard, to afford, if appropriate, both the state and the defendant an opportunity to present additional evidence, to allow both sides to comment on or rebut information in any presentence or medical report, and to afford the defendant an opportunity to be heard in person).

> detailed five times since the murder; (7) the trial court erred in instructing the jury on and in finding the CCP aggravator; (8) the sentence was disproportionate and the trial court erred in instructing the jury on and in finding the burglary aggravator.

Id. at 738 n.6.  The Florida Supreme Court rejected these arguments and affirmed.  Id. at 738-47; Ex. 32.  Petitioner filed a petition for writ of certiorari, see Ex. 33, which was denied on November 26, 2001.  Bradley v. Florida, 534 U.S. 1048 (2001); Ex. 35.

On November 14, 2002, Petitioner filed a motion for post-conviction relief pursuant to Fla. R. Crim. P. 3.850 and 3.851, with a request for leave to amend.  Ex. 36.  Thereafter, on September 22, 2003, he filed an amended motion (hereinafter 3.850 motion), see Ex. 37, in which he raised the following eighteen claims:

> (1) trial counsel rendered ineffective assistance when he failed to properly preserve the issue that the burglary charge was legally invalid under Delgado v. State, 776 So.2d 233 (Fla. 2000), because Mrs. Jones invited the "burglars" into the house; (2) trial counsel was ineffective because he failed to discover the State's nondisclosure of certain exculpatory evidence under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), false testimony under Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), as well as newly discovered evidence; (3) trial counsel was ineffective for failing to fully investigate, prepare and present mitigation; (4) Bradley was denied his right to an evaluation by a competent mental health expert pursuant to Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); (5) trial counsel was ineffective for failing to object to improper arguments by the prosecutor during the penalty phase, to request curative instructions, and to argue the correct law in his closing argument; (6) the standard jury instructions given during the penalty phase improperly shifted the burden of proof to the defendant to establish that the mitigating factors outweighed any aggravating factors proven by the State; (7) trial counsel was ineffective by failing to object and request a curative instruction when the prosecutor urged the jury to consider an invalid aggravating factor (being killed in one's own home); (8) the

9

sentencing jury was misled by comments, questions, and instructions by the prosecutor and the trial court that unconstitutionally and inaccurately diluted the jury's sense of responsibility as to their recommendation, in violation of <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and trial counsel was ineffective for failing to object to and ask for a curative instruction; (9) Florida Rule of Professional Conduct 4-3.5(d)(4), which precludes counsel from conducting interviews with the jurors, is unconstitutional because it denies the defendant access to court and violates his rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; (10) Bradley's federal and state constitutional rights against cruel and unusual punishment will be violated because he may be incompetent at the time of execution; (11) the death penalty is unconstitutional because execution by electrocution and lethal injection are cruel or unusual or both; (12) Florida's capital sentencing statute is unconstitutional on its face and as applied because it fails to prevent arbitrary and capricious imposition of the death penalty; (13) the "murder in the course of a felony" aggravator is unconstitutional because it is an automatic aggravating factor; (14) the jury instruction on the pecuniary gain aggravator is overly broad and vague; (15) Florida's capital sentencing structure is unconstitutional in light of <u>Ring v. Arizona</u>, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (16) Florida's capital sentencing structure is unconstitutional in light of <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); (17) Bradley is being denied effective legal representation because public records from various agencies have either not been provided or are incomplete in violation of chapter 119, Florida Statutes (2003); and (18) the cumulative effect of procedural and substantive errors in Bradley's trial deprived him of a fair trial.

<u>Bradley v. State</u>, 33 So.3d 664, 670 n.6 (Fla. 2010) (per curiam); Ex. 45.

On February 27, 2004, the postconviction court held a <u>Huff</u> hearing[6] and ordered an evidentiary hearing on claims one through four and claim eighteen. <u>See</u> Ex. 41 at 1168. An evidentiary hearing was conducted on September 15, 2005, and then recessed to permit DNA testing of hair and fingernail scrapings found on the victim's body and to allow post-conviction counsel to explore potential mental health mitigation. <u>Id</u>. at 1169. On June 21, 2007, after the DNA testing revealed that the evidence submitted belonged to the victim, the circuit court entered an order denying the 3.850 motion. <u>Id</u>. at 1168-1203.

Petitioner appealed the denial of his 3.850 motion to the Florida Supreme Court, raising the following issues: (1) trial counsel failed to fully investigate and utilize the duct tape evidence, resulting in a flawed decision as to the proper defense theory; (2) trial counsel was ineffective for withholding certain mental illness evidence from defense experts and the trial judge because disclosing such evidence could have allowed for a finding of extreme mental or emotional disturbance; (3) trial counsel was ineffective for failing to preserve for direct appeal the argument that he could not be found guilty of burglary because the victim's wife invited him into the house and that under the later decision in <u>Delgado v. State</u>, 776 So.2d 233 (Fla. 2000), the initial consent for entry could not be deemed revoked after he and the McWhite brothers committed crimes against the victim; and (4) the cumulative effect of counsel's errors amounted to ineffective assistance of counsel. <u>See</u> Ex. 42.

---

[6] <u>Huff v. State</u>, 622 So.2d 982, 983 (Fla. 1993) (per curiam) (holding that in a capital post-conviction proceeding, a judge must allow the attorneys the opportunity to appear before the court and be heard on an initial 3.850 motion for the purpose of determining whether an evidentiary hearing is required and to hear legal argument relating to the motion).

At the time Petitioner appealed the denial of his 3.850 motion, he also filed a petition for writ of habeas corpus in the Florida Supreme Court, in which he argued that appellate counsel was ineffective for failing to raise the following issues on direct appeal: (1) the trial court erred in denying motions alleging that Florida's death penalty statutes were unconstitutional because: (a) the listed statutory aggravating factors are unconstitutionally vague, overbroad, arbitrary, and capricious; (b) they provide for arbitrary jury overrides and for arbitrary sentencing; (c) they do not instruct the jury to give mitigating circumstances enough weight, and the death penalty is unconstitutional; (d) they should require separate juries for the guilt and penalty phases; (e) the aggravating circumstance that the murder was committed during commission of a felony is unconstitutional as automatic; (f) electrocution is cruel and unusual punishment; and (g) the HAC aggravating factor is unconstitutional; and (2) the trial court erred in denying two motions to suppress.  See Ex. 50.

On January 7, 2010, the Florida Supreme Court affirmed the denial of post-conviction relief and denied the petition for writ of habeas corpus.  Bradley v. State, 33 So.3d at 671-86; Ex. 45.  Petitioner's motion for rehearing was denied on April 22, 2010.  Ex. 46.  This federal habeas case followed.

### III.  Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted).  "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold

an evidentiary hearing." Id.  The pertinent facts of this case are fully developed in the record

before the Court.  Because this Court can "adequately assess [Petitioner's] claim[s] without

further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an

evidentiary hearing will not be conducted.

## IV.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110

Stat. 1214 (hereinafter AEDPA), this Court's review "is 'greatly circumscribed and highly

deferential to the state courts.'  Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002)."

Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1208 (11th Cir. 2007).

> Under AEDPA, when a state court has adjudicated the
> petitioner's claim on the merits,[7] a federal court may not grant
> habeas relief unless the state court's decision was "contrary to,
> or involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United
> States," 28 U.S.C. § 2254(d)(1), or "was based on an
> unreasonable determination of the facts in light of the evidence
> presented in the State court proceeding," id. § 2254(d)(2).  A
> state court's factual findings are presumed correct unless
> rebutted by clear and convincing evidence.[8]  Id. § 2254(e)(1);
> Ferrell v. Hall, 640 F.3d 1199, 1223 (11th Cir. 2011).

---

[7] "[T]he highest state court decision reaching the merits of a habeas petitioner's claim is
the relevant state court decision."  Newland v. Hall, 527 F.3d 1162, 1199 (11th Cir. 2008).
Additionally, in Harrington v. Richter, 131 S.Ct. 770, 785 (2011), the United States Supreme
Court held that § 2254(d) "does not require a state court to give reasons before its decision
can be deemed to have been 'adjudicated on the merits.'"  The Court explained, "[w]hen a
federal claim has been presented to a state court and the state court has denied relief, it may
be presumed that the state court adjudicated the claim on the merits in the absence of any
indication or state-law procedural principles to the contrary."  Id. at 784–785.

[8] "This presumption of correctness applies equally to factual determinations made by
state trial and appellate courts."  Bui v. Haley, 321 F.3d 1304, 1312 (11th Cir. 2003) (footnote
omitted) (citing Sumner v. Mata, 449 U.S. 539, 547 (1981)).

AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, —— U.S. ——, ——, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003)).   The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013).

## V. Findings of Fact and Conclusions of Law

### A. Ground One

In ground one, Petitioner raises three ineffective assistance of counsel claims.  "To prevail on th[ese] claim[s], [Petitioner] must meet both the deficient performance and prejudice prongs of Strickland." Wong v. Belmontes, 558 U.S. 15, 16 (2009) (per curiam) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).

To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." 466 U.S. at 688, 104 S.Ct. 2052.  A court considering a claim of ineffective assistance

14

must apply a "strong presumption"[9] that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S.Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S.Ct. 2052.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S.Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S.Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S.Ct. 2052.

Harrington v. Richter, 131 S.Ct. 770, 787-88 (2011).  Since both prongs of the two-part

Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not

address the performance prong if the petitioner cannot meet the prejudice prong, and vice-

versa." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010) (citation omitted).

"In considering claims that counsel was ineffective at the penalty phase of trial, [the

Court must] determine 'whether counsel reasonably investigated possible mitigating factors

---

9 A court begins "with the 'strong presumption' that counsel's conduct was reasonable, Strickland, 104 S.Ct. at 2065; and that presumption is even stronger when we examine the performance of experienced counsel. Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc)." Walls v. Buss, 658 F.3d 1274, 1279 (11th Cir. 2011) (per curiam). The record reflects that Petitioner's attorney at trial, Alan Chipperfield, Esquire, had been practicing law since 1976. Ex. 40 at 793. He had been a public defender from 1979 through 1992, and returned to that position in 1995. Id. Petitioner's case was Mr. Chipperfield's seventy-fifth capital case and the fifteenth case he had taken to the penalty phase. Id. at 864-65. Curt Davidson, Esquire, was the "second chair" attorney assisting Mr. Chipperfield. Id. at 869.

and made a reasonable effort to present mitigating evidence to the sentencing court.'"

Stewart, 476 F.3d at 1209 (quoting Henyard v. McDonough, 459 F.3d 1217, 1242 (11th Cir.

2006)); see also Porter v. McCollum, 558 U.S. 30, 39 (2009) ("It is unquestioned that under

the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to

conduct a thorough investigation of the defendant's background'") (quoting Williams v.

Taylor, 529 U.S. 362, 396 (2000)).   With respect to the prejudice prong, Petitioner "must

show that but for his counsel's deficiency, there is a reasonable probability he would have

received a different sentence.   To assess that probability, we consider 'the totality of the

available mitigation evidence - both that adduced at trial, and the evidence adduced in the

habeas proceeding' - and 'reweig[h] it against the evidence in aggravation.'"  Porter, 558 U.S.

at 41 (quoting Williams, 529 U.S. at 397-398); see also Sears v. Upton, 130 S.Ct. 3259, 3267

(2010) (finding that a proper prejudice analysis must take into account the newly uncovered

mitigating evidence, along with the mitigation evidence introduced during the defendant's

penalty phase trial, to assess whether there is a reasonable probability that the defendant

"would have received a different sentence after a constitutionally sufficient mitigation

investigation") (citations omitted).

> Where, as here, the petitioner challenges the scope of his
> attorneys' investigation and the reasonableness of their strategic
> choices, a further word about attorney performance is
> warranted.   Strickland makes plain that a reviewing court's
> objective "is not to grade counsel's performance."  466 U.S. at
> 697, 104 S.Ct. at 2069.  We do not measure counsel against
> what we imagine some hypothetical "best" lawyer would do, in
> part to avoid "the distorting effects of hindsight" and in part to
> avoid judicial interference with "the constitutionally protected
> independence of counsel," lest we "restrict the wide latitude
> counsel must have in making tactical decisions." Id. at 689, 104

S.Ct. at 2065.  We instead "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." Id.

Underpinning Strickland, then, is the assumption that "[t]here are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way." Id. at 689–90, 104 S.Ct. at 2065–66.  Crucially, Strickland permits attorneys to choose between viable avenues of defense, and attorneys are not ineffective for making a reasonable choice to take one avenue to the exclusion of another, or for selecting a reasonable course without considering some other, equally reasonable course.  "If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And, our inquiry is limited to whether that strategy, that is, course A, might have been a reasonable one." Chandler v. United States, 218 F.3d 1305, 1315 at n.16 (11th Cir. 2000).

LeCroy v. United States, No. 12-15132, 2014 WL 129022, at *12 (11th Cir. Jan. 15, 2014).

A state court's adjudication of an ineffectiveness claim is accorded great deference.

The question "is not whether a federal court believes the state court's determination" under the Strickland standard "was incorrect but whether that determination was unreasonable - a substantially higher threshold." Schriro, supra, at 473, 127 S.Ct. 1933.  And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).  Thus, the standards created by Strickland and § 2254(d) are both highly deferential, "and when the two apply in tandem, review is 'doubly' so[.]"  Harrington, 131 S.Ct. at 788 (quoting Knowles, 556 U.S. at 123).

In his first subclaim in ground one, Petitioner contends that he received ineffective assistance of trial counsel because counsel withheld from defense experts and the trial judge evidence of Petitioner's mental health and failed to present Petitioner's mental health records at the penalty phase of trial.  In his Reply, Petitioner elaborates on this claim, stating that his argument is two-fold:

> first, that trial counsel did not utilize the mental health mitigation gathered during the presentation at the Spencer hearing; and second, that counsel withheld mental heath records from his experts so that a jury would never know about them and then failed to give them to the experts in consideration for the Spencer hearing.  Trial counsel confessed this error and admitted it was not a strategic decision, he simply never even thought about presenting the evidence to the trial judge at the Spencer hearing or turning over the documents to the mental health experts.  (PCR 851-852 and 944[10]).

Reply at 3-4.

---

[10] At the evidentiary hearing on the 3.850 motion, Mr. Chipperfield testified that he did not present evidence of Petitioner's "mental health illness and prior drug dependency" to the trial court at the Spencer hearing. Ex. 40 at 851.  When asked if, in retrospect, he thought he should have presented such evidence, Mr. Chipperfield responded, "Probably should have, because I don't think at that point it would have done any harm." Id. at 852.  Mr. Chipperfield was also asked, "once you made the decision not to use [Dr. Krop] for jury purposes, you could have made the decision to utilize him for the purposes of the Spencer hearing?" Id. at 944. Mr. Chipperfield responded, "Yes." Mr. Chipperfield was then asked, "But you didn't do that?" Id. Mr. Chipperfield replied, "I did not." Id.

Petitioner raised this claim in his 3.850 motion, see Ex. 37 at 411-19, and the trial court found it to be without merit.  Ex. 41 at 1190-91.[11]  Petitioner also raised this claim on appeal of the order denying the 3.850 motion, and after identifying Strickland as the controlling legal authority, the Florida Supreme Court adjudicated this claim as follows:

> In Bradley's second claim he contends that trial counsel was ineffective in preparing for the penalty phase because he withheld from his defense experts one page of Bradley's mental health records, which indicated Bradley had an increased risk of violent behavior without medication.  Bradley claims that withholding the page precluded the defense experts from properly evaluating him and prevented them from developing sufficient mitigation to allow for a finding of the statutory mitigator of extreme mental or emotional disturbance.  He also criticizes trial counsel for deciding not to present the testimony of his defense experts at trial.  At oral argument, postconviction counsel argued that even if trial counsel reasonably kept the record from his experts to preclude their use by the prosecution, trial counsel should have changed his strategy after the jury's death recommendation and should have presented all mental health information to the judge at the Spencer hearing.  Bradley also argues that trial counsel's strategy for presentation of mitigation evidence was deficient.  As explained below, we disagree with each of these contentions.
>
> The postconviction court found that trial counsel conducted an extensive penalty phase and mitigation investigation.  The court also concluded that counsel adequately explained why he chose not to present all the mental health information in mitigation.  At the evidentiary hearing, Bradley's trial counsel testified that in preparation for the penalty phase, he obtained and reviewed records outlining Bradley's social and medical history.  Among those records were Bradley's drug

---

[11] The trial court did not address the contention that, even if counsel made the strategic decision not to present such evidence to the jury, counsel should have presented the evidence to the judge at the Spencer hearing.  However, as the following quotation demonstrates, the Florida Supreme Court did adjudicate this portion of this ineffectiveness claim.  See infra at 24-25.

treatment records from CARE, his criminal history, medical records, divorce records, child support records, and some records from the Department of Children and Families.  Trial counsel testified that Bradley's CARE records from 1987 (eight years before the murder) indicated that he had suffered from cocaine and marijuana dependency, depression, and a moderately severe mental disorder for a long period of time.  The records also indicated that "when patient is not self-medicating, he experiences high anxiety, high anger, possible bipolar symptoms, increased violence and risk of violent behavior without his RX medications."  Another note indicated that Bradley was experiencing mood swings and had experienced long-term problems with anger and rage.

Trial counsel hired Dr. Harry Krop, a psychologist, and Dr. Roger Szuch, a family counselor and expert in dysfunctional families, to assist him in preparation of possible mental health mitigation.  Counsel supplied Dr. Krop and Dr. Szuch with numerous pages of psychiatric records, including most of Bradley's CARE records.  He also supplied his experts with records of his interviews with family members, a case summary, the McWhite brothers' statements, a copy of certain medical records concerning Bradley's treatment for an anxiety disorder, and a copy of Bradley's criminal history.  Trial counsel asked Dr. Krop to conduct neuropsychological testing and also obtained and forwarded to Dr. Krop records concerning a 1977 auto accident.  Bradley told Dr. Krop that he did not have a drinking problem, was taking prescription Xanax, was not using any illegal drugs the night of the murder, and had been drug-free during the five years before the murder.

Trial counsel explained that he did not focus on Bradley's drug abuse problems at trial because they did not fit in with his strategic decision to present Bradley as a productive member of society.  He testified:

> I wanted the jury to think that this [murder] was an aberration in behavior for Donald Bradley and that he was otherwise a productive, hard working member of society and drugs go against that.  You can-you can put both in but I didn't think it would serve us best to put psychological testimony on because it kind of conflicts with what I was trying

20

to show to the jury, that this was an aberration in his behavior and he's normally not like that.[12]

Trial counsel further explained:

I think probably Clay County is more conservative even than Duval County and . . . I think I knew back then that, you know, they don't like drugs, they don't like excuses, they like the death penalty.[13]

Trial counsel presented testimony from Bradley's wife that he had overcome his drug problems.   Further, counsel intentionally withheld from his defense experts one page of the CARE records because it discussed Bradley's increased anxiety, possible bipolar symptoms, and increased risk of violence without prescription medications.  Counsel testified that he often excluded portions of the records he sent his experts, explaining:

[Y]ou don't want to mislead your expert. You have to keep credible with the expert and you have to be honest with him so he can reach an honest opinion, but at the same time you have to be aware that he is going to be subject to cross-examination about every piece of paper he gets because that can be turned over to the other side.   When there are things in the paper that could be good cross or could provide good fuel for cross, you have to decide whether to send it to the expert or not.   If it's likely the other side has it anyway, then you send it because they're going to be able to cross if they have it and he doesn't have it, then they can cross on it and . . . then not only have they put in the bad stuff, but they have discredited your witness and in a roundabout way

---

[12] See Ex. 40 at 922-23.

[13] See Ex. 40 at 855-56.

discredited you because you didn't send it to your witness.[14]

Although trial counsel decided not to give his experts the records that showed Bradley had anger problems and was prone to violence when not on his medications, trial counsel testified that during Dr. Krop's clinical interview, Bradley told the doctor about his anxiety, rage, and panic attacks.  Bradley said he would "rage until I forget what I'm doing and I reach peaks of great madness."[15]   Trial counsel did not present this information at trial because he was concerned that it might remind the jury of Brian McWhite's testimony that he unsuccessfully tried to get Bradley to stop beating Mr. Jones. Trial counsel did not believe information about Bradley's anger and rage when not medicated would be well-received by the jury.

When asked why he did not present the mental health experts to testify during the penalty phase, trial counsel explained that he did not ask his experts to testify because they had information that he wished to keep from the jury.  The experts had records showing that Bradley had been in prison, had been delinquent in paying child support, and was involved in incidents of domestic abuse both with a prior girlfriend and with his former wife.  Another record possessed by the experts indicated that Bradley had severely beaten his ex-wife while she was pregnant and that he had abused a former girlfriend's children.   Additional records showed that Bradley had been charged with aggravated assault against either a girlfriend or his former wife.  Presenting his experts in the penalty phase could have resulted in this information being revealed to the jury, and trial counsel did not believe any of it would benefit Bradley.

Trial counsel decided that, instead of presenting potential mitigation through expert testimony, it would be better to present it through the testimony of Bradley's family.  Thus, counsel presented several members of Bradley's family who testified that Bradley had endured an abusive childhood and dysfunctional

---

[14] See Ex. 40 at 941-42.

[15] See Ex. 40 at 956.

early home life and had suffered anxiety attacks.  They also testified that he had drug problems in the past.  However, since the strategy was to show that Bradley had overcome these difficulties and had gone on to become a productive member of society, his family members also testified that Bradley's difficult childhood and drug-abuse problems were behind him.

## Deficiency

We conclude that trial counsel's decision not to provide his experts with one page of mental health records suggesting that Bradley might be prone to violence without his medications, as well as counsel's ultimate decision not to call the mental health experts to testify during the penalty phase, were strategic choices based on an informed and reasoned plan of action. Trial counsel painstakingly investigated potential mitigation, including mental mitigation material.  He strategically determined that presenting all the drug and mental information to the jury would not be beneficial, would open the door to the prosecution's cross-examination concerning it, and would conflict with his theory that Bradley was generally a hard-working, productive member of society who had simply deviated from his generally good character.  These informed choices were reasonable strategic decisions. See Card v. State, 992 So.2d 810, 816 (Fla. 2008) (concluding that counsel reasonably utilized lay testimony to attempt to humanize the defendant); Miller v. State, 926 So.2d 1243, 1252 (Fla. 2006) (determining that defense counsel reasonably chose not to present certain mental health records via testimony of a psychologist and instead presented the information through sympathetic testimony of defendant's family members); Gaskin v. State, 822 So.2d 1243, 1248 (Fla. 2002) ("Trial counsel will not be held to be deficient when she makes a reasonable strategic decision to not present mental mitigation testimony during the penalty phase because it could open the door to other damaging testimony."); Rutherford v. State, 727 So.2d 216, 222-23 (Fla. 1998) (concluding that counsel reasonably made the decision to focus on defendant's "solid, 'Boy Scout' character traits," humanize him, and advance the theory that he was a "'good ol' fellow' who must have just lost it") (quoting trial court's order); Haliburton v. Singletary, 691 So.2d 466, 471 (Fla. 1997) (determining that trial counsel's penalty phase strategy to

23

humanize the defendant and not call any mental health experts was not ineffective assistance of counsel).

Moreover, we note, as did the postconviction court, that Bradley asserted in his postconviction motion that he would present his own mental health experts at the evidentiary hearing to testify that the excluded mental health information would have provided a basis for finding the extreme mental or emotional disturbance mitigator. Nonetheless, he presented no experts at the hearing. Accordingly, for all the foregoing reasons, we conclude that Bradley has not demonstrated that trial counsel was deficient in deciding to withhold one page of the CARE records from his experts and in deciding not to present the experts to testify in the penalty phase.

We also reject Bradley's assertion that trial counsel had an obligation to change his strategy at the <u>Spencer</u> hearing. Counsel was not deficient in making an informed, reasoned, strategic decision to maintain his general mitigation strategy at the <u>Spencer</u> hearing. We cannot agree that after the jury recommended death, there was "nothing left to lose" and that trial counsel had an absolute duty to use all the mental health evidence at his disposal. The excluded evidence would have portrayed Bradley as violent and abusive, contrary to the mitigation presented to the jury. Thus, under the facts of this case, trial counsel had no duty to change his strategy of presenting Bradley as a man who had overcome his tragic past to one depicting him as a deeply scarred, drug-addicted, mentally ill man with a history of rage and panic attacks.

Although the strategy chosen by trial counsel and Bradley did not prevail, that fact alone does not render the strategy unreasonable or deficient. Were that the test, all defendants sentenced to death would have claims for ineffective assistance of trial counsel. <u>See</u> <u>Heath v. State</u>, 3 So.3d 1017, 1029 (Fla. 2009) ("The fact that this defense strategy was ultimately unsuccessful with the jury does not render counsel's performance deficient."); <u>see</u> <u>also</u> <u>Henry v. State</u>, 948 So.2d 609, 616 (Fla. 2006) ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence . . . .") (quoting <u>Strickland</u>, 466 U.S. at 689, 104 S.Ct. 2052). Accordingly, Bradley has failed to demonstrate that his trial counsel was deficient in his investigation or presentation of

mental health mitigation.  Thus, the first prong of Strickland has not been established.

Prejudice

Even if trial counsel's actions could be considered deficient, we conclude Bradley has not met the prejudice prong of Strickland.  As we explained earlier, to meet this prong, the claimant must "establish prejudice [and] 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  Williams, 529 U.S. at 391, 120 S.Ct. 1495 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052).

Even if Bradley's trial counsel was deficient in failing to present the additional mental health information, there is no reasonable probability that presenting Bradley as a man with "mental infirmities" (as postconviction counsel asserts should have been done) would have resulted in a lesser sentence. The trial court sentenced Bradley to death upon a finding of four aggravating factors, including two of the weightiest aggravators-that the capital felony was especially heinous, atrocious or cruel (HAC), and that the murder was committed in a cold, calculated and premeditated manner (CCP). See Morton v. State, 995 So.2d 233, 243 (Fla. 2008) ("This Court has previously stated that CCP and HAC are two of the weightiest aggravators in Florida's statutory sentencing scheme.").  Thus, we conclude that even if this additional mental mitigation had been presented, in light of the considerable aggravation, there is no reasonable probability that the outcome would have been different.  See Breedlove v. State, 692 So.2d 874, 878 (Fla. 1997) (finding no prejudice because the case's strong aggravating factors would have overwhelmed the mitigation evidence of the defendant's history of drug addiction and his troubled childhood); Tompkins v. Dugger, 549 So.2d 1370, 1373 (Fla. 1989) (same). Bradley has provided nothing to undermine our confidence in the death sentence imposed in his case. Accordingly, Bradley has failed to show that the prejudice prong has been satisfied.  Bradley's claim that trial counsel was ineffective in his mental health mitigation preparation and presentation is without merit.

Bradley v. State, 33 So.2d at 676-81 (footnotes omitted).

As noted previously, the highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision under AEDPA. Thus, there is a qualifying decision under AEDPA with respect to this ineffectiveness claim from the Florida Supreme Court. Next, this Court must consider the "contrary to" and "unreasonable application" components of the statute. "It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide." Brown v. Head, 272 F.3d 1308, 1313 (11th Cir. 2001). Upon thorough review of the record and the applicable law, this Court concludes that the Florida Supreme Court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Petitioner is not entitled to relief on subclaim one of ground one.[16]

---

[16] In the discussion of this ineffectiveness claim, Petitioner also states in a wholly conclusory fashion that he was denied his right to an evaluation by a competent mental health expert in violation of Ake v. Oklahoma, 470 U.S. 68, 72 (1985). See Petition at 10-11. The Court notes that Petitioner raised an Ake claim in his 3.850 motion as ground four, and the trial court found it was procedurally barred because it could have and should have been raised on direct appeal. Ex. 41 at 25. Additionally, Petitioner did not raise an Ake claim in the appeal of the order denying the 3.850 motion. Thus, his Ake claim is procedurally barred. However, Respondents do not assert that this claim is procedurally barred. In any event, insofar as Petitioner may be arguing that the failure to provide some portions of his CARE records to his mental heath experts denied him a competent mental evaluation, the Court finds this claim to be without merit. As noted by the Florida Supreme Court: "Although trial counsel decided not to give his experts the records that showed Bradley had anger problems and was prone to violence when not on his medications, trial counsel testified that during Dr. Krop's clinical interview, Bradley told the doctor about his anxiety, rage, and panic attacks." Bradley v. State, 33 So.3d at 678. Thus, Dr. Krop had such information in evaluating Petitioner's mental health.

In subclaim two of ground one, Petitioner contends that he received ineffective assistance of counsel because counsel failed to present evidence of Petitioner's chaotic childhood and dysfunctional family life during the penalty phase.  See Petition at 14-16. Petitioner acknowledges that counsel did present such evidence at the penalty phase, but argues that "trial counsel could have better presented and argued [this] evidence." Id. at 15. Petitioner also asserts that "trial counsel did not present any expert testimony as to how this abuse contributed to the defendant's psychological state in general or at the time of the offense." Id.

Although Respondents assert this claim was raised in Petitioner's 3.850 motion and on appeal of the denial of that motion, a review of the record reveals that not all of these particular factual allegations in support of Petitioner's ineffectiveness claim at the penalty phase were raised in state court.  See Ex. 37 at 408-20 (Petitioner's third claim in his 3.850 motion, contending that counsel should have developed and presented additional mental health mitigating evidence at the penalty phase).  In the third claim of the 3.850 motion, the only reference to Petitioner's abusive childhood is a brief assertion that mental health professionals could have provided the jury with non-statutory mitigating circumstances regarding Petitioner's "traumatic and abusive childhood and family history," but they "were not provided with adequate materials to make this assessment." Ex. 37 at 414.

In the order denying the 3.850, the trial court did not specifically address this contention, but did note that "Mr. Chipperfield set out at the evidentiary hearing the basis for his strategic decisions not to present certain evidence to the jury for its consideration in mitigation." Ex. 41 at 23.  Thereafter, the trial court cited portions of the evidentiary hearing

transcript, including the portion where Mr. Chipperfield testified that he discussed with both defense experts the mental and sexual abuse Petitioner suffered as a child; however, the psychologist, Dr. Szuch, told Mr. Chipperfield that he could not make a connection between the abuse Petitioner suffered as a child and the murder.  See Ex. 40 at 915-16.  Mr. Chipperfield stated that he did not think Dr. Szuch was a strong witness and that he preferred to call family members to testify about the Petitioner's dysfunctional childhood.  Id. at 915.  Mr. Chipperfield testified that Petitioner had arguably "escaped the deprived childhood and shown that he could do well."  Id. at 916.  Mr. Chipperfield testified that he ultimately decided not to call Dr. Szuch and Dr Krop as witnesses because he was concerned that, on cross-examination, the State would elicit undesirable information regarding the Petitioner's prior prison sentence, his problems with paying child support, and his violent behavior with his prior wife and girlfriend.  Id. at 916-18.

The trial court concluded:

> In deciding not to present certain evidence in mitigation, Mr. Chipperfield's testimony was clear that he considered the type of evidence, the value of the evidence as well as the evidence that could be brought out by the State that would have hurt the Defendant.  Since tactical decisions do not constitute ineffective assistance, this Court finds that counsel's performance was not deficient. . . .

Ex. 41 at 1191 (citations omitted).

In appealing the denial of claim three of the 3.850 motion, appellate counsel did not specifically argue that trial counsel could have better presented evidence of Petitioner's chaotic childhood and dysfunctional family life during the penalty phase.  Nor did he claim that trial counsel failed to present any expert testimony as to how this abuse contributed to

Petitioner's psychological state in general or at the time of the offense.  See Ex. 42 at 32-40.

Instead, appellate counsel briefly referred to trial counsel's reasoning for withholding certain

information from the defense experts: that the prosecution would cross-examine the experts

"in front of the jury regarding Bradley's drug use and his family's history of violence . . . and

such would have thwarted the efforts to present Bradley as an otherwise normal person

whose participation in this event was an aberration worthy of sympathy."  Id. at 35.

Even though the specific claim raised here in subclaim two of ground two was not

adequately raised in state court, it appears the Florida Supreme Court rejected any such

argument in the order affirming the denial of the 3.850 motion.  Specifically, the Florida

Supreme Court stated:

> Trial counsel decided that, instead of presenting potential mitigation through expert testimony, it would be better to present it through the testimony of Bradley's family.  Thus, counsel presented several members of Bradley's family who testified that Bradley had endured an abusive childhood and dysfunctional early home life and had suffered anxiety attacks.  They also testified that he had drug problems in the past.  However, since the strategy was to show that Bradley had overcome these difficulties and had gone on to become a productive member of society, his family members also testified that Bradley's difficult childhood and drug-abuse problems were behind him.

> Deficiency

> We conclude that trial counsel's decision not to provide his experts with one page of mental health records suggesting that Bradley might be prone to violence without his medications, as well as counsel's ultimate decision not to call the mental health experts to testify during the penalty phase, were strategic choices based on an informed and reasoned plan of action. Trial counsel painstakingly investigated potential mitigation, including mental mitigation material. He strategically determined that presenting all the drug and mental information to the jury

29

> would not be beneficial, would open the door to the prosecution's cross-examination concerning it, and would conflict with his theory that Bradley was generally a hard-working, productive member of society who had simply deviated from his generally good character.  These informed choices were reasonable strategic decisions. . . .

Bradley v. State, 33 So.3d at 678-79 (citations omitted).

Thus, there is a qualifying decision under AEDPA  from the Florida Supreme Court with respect to the claim that trial counsel was ineffective in his presentation of evidence of Petitioner's chaotic childhood and dysfunctional family life during the penalty phase.  Upon thorough review of the record and the applicable law, this Court concludes that the Florida Supreme Court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Accordingly, Petitioner is not entitled to relief on his ineffectiveness claim raised in subclaim two of ground one.

In subclaim three of ground one, Petitioner argues that trial counsel was ineffective because he failed to properly investigate and use duct tape evidence during the guilt phase of trial.  Petition at 16-17.  Petitioner raised this claim in his 3.850 motion, and the trial court found it to be without merit.  Ex. 41 at 1176-78, 1183-85.  Petitioner also appealed the denial of this claim, and the Florida Supreme Court adjudicated the issue as follows:

### I. The Duct Tape Evidence

> In Bradley's first claim, he argues that trial counsel was ineffective by failing to fully examine the duct tape evidence and use it to properly formulate his defense theory.  He asserts that the alibi defense chosen by counsel was flawed and that had

trial counsel properly investigated the evidence, he would have realized that Mrs. Jones moved about the house and the garage before calling 911. During this time, Bradley argues, Mrs. Jones could have obtained a tire iron from her car in the garage and used it to "finish off" her husband. Had trial counsel understood and properly used this knowledge, Bradley maintains, he would have chosen the independent act theory and contended that Mrs. Jones was the actual murderer because she struck the final blow. On this claim, the postconviction court ruled that there was evidence to support the alibi defense and that counsel made a reasonable tactical choice in utilizing that theory. Further, the court found that use of the alibi defense was approved by Bradley himself. The court also found that counsel did use the independent act theory as a backup defense and noted that an independent act instruction was included in the instructions given to the jury at the conclusion of the guilt phase.

At the postconviction evidentiary hearing, Bradley's trial counsel, Alan Chipperfield, testified that he had been an attorney since 1976, worked as a public defender for twenty-two years, and handled many capital cases before Bradley's trial. He testified that Bradley's case was his seventy-fifth death case and the fifteenth death case he had taken to the penalty phase. Trial counsel had organized and given many seminars on how to handle death cases and was still on the steering committee for planning each year's seminar.

When asked why he chose an alibi theory of defense over the independent act theory, trial counsel responded that since Bradley's wife planned to testify that Bradley was at home with her at the time of the murder, and the police had no physical evidence linking Bradley to the murder, counsel concluded that an alibi defense was the better theory. Trial counsel also explained that it would have been very difficult to present a defense that Bradley had assaulted but not killed the victim and that the victim's wife had done so, while at the same time arguing that he was not even at the house. Moreover, trial counsel explained that a palm print found at the scene did not match any of the defendants or the victim, which allowed the defense to focus on the possibility that an unknown person had committed the murder. Trial counsel also pointed out that the testimony of the McWhite brothers contained numerous

31

contradictions, and he spent a good deal of time at trial arguing that the brothers were lying.

The State had records for Bradley's cell phone showing that numerous calls had been made to the Jones home around the time of the murder, which the State contended showed the final planning of the murder.  Trial counsel testified that he felt it was significant that he was able to present Bradley's sister, Cindy, to testify that she, and not Bradley, had used Bradley's cell phone that night to make the calls to her friend Mrs. Jones around the time of the murder.

In support of her husband's alibi defense, Mrs. Bradley testified at trial that on November 7, 1995, her husband came home from work about 7 p.m., but left again at approximately 8 p.m. for about forty-five to fifty minutes to buy some snacks. According to Mrs. Bradley, her husband returned home with the snacks about 8:45 or 8:50 p.m. and they watched a movie from 9 p.m. to 11 p.m.  Trial counsel also elicited testimony from Mrs. Bradley that Charles Shoup, a man for whom Bradley did landscaping work, called at about 8 p.m., as Bradley was leaving to go to buy the snacks.  Mrs. Bradley testified that she answered the telephone and then handed it to her husband, who spoke with Shoup.  According to Mrs. Bradley, the two did not talk long because Bradley told Shoup that he was just leaving and would call him back later. Trial counsel did not, however, rely solely on Mrs. Bradley's testimony.  Trial counsel also called Shoup to testify. Although Shoup called the Bradley home often, he did not specifically remember calling on November 7, 1995, or talking to Bradley.  Shoup's telephone records were submitted and showed a thirty-second call from Shoup's telephone to the Bradley home at 7:54 p.m.

At trial, the defense called an investigator to testify that the distance between the McWhite brothers' residence and the Jones residence was twenty-two miles.   The investigator testified that it would have been impossible for Bradley to have been home at 7:54 p.m. to talk to Shoup, then drive to the brothers' residence to pick them up, drive to the Jones' home, murder Mr. Jones, drop the brothers off, pick up snacks, and be back home by 8:45 or 8:50 p.m. to watch a movie.  Due to the distance between the houses, trial counsel argued to the jury

that forty-five minutes was not enough time for Bradley to have committed the murder.

Evidence showed that all of the duct tape used in the assault was from the same roll.  Tape from that same roll was found wadded up in the garage, and trial counsel argued to the jury that the wadded up tape was the tape used to bind Mrs. Jones' hands and that she must have left it in the garage when she went there to retrieve the tool she used to strike her husband.  He also commented on the fact that the shower was wet and argued that there would have been no reason for the shower to be wet unless Mrs. Jones had taken a shower to wash off the blood she had gotten on herself after beating her husband to death.  Since there was evidence presented at trial that an L-shaped wound was found on the victim's skull that was arguably inconsistent with being caused by the "Zulu war stick," trial counsel employed his fall-back "independent act" theory during his final argument to argue that the L-shaped injury was incurred when Mrs. Jones struck Mr. Jones with the tire iron or some other metal object.  Trial counsel also pointed out that spots found in the car in the garage, a teal Buick, tested positive for possible blood under a luminol test and asked the jury rhetorically, "What did Mrs. Jones go into the car for?"  He argued that Mrs. Jones had the opportunity to get rid of the murder weapon before the police arrived by throwing it in the lake near her home and that, although it had been searched, the lake was large and the police could have missed it.  Trial counsel further pointed out that according to the McWhites' testimony, the position that Mr. Jones was found in was different from that in which they left him.  Moreover, during closing argument, trial counsel suggested that if the jury did not believe Bradley was at home with his wife, they should believe the McWhite brothers' testimony that their intent was only to "rough up" the victim and that Bradley's intent was the same.  It is in the context of this trial scenario that we examine Bradley's claim that trial counsel was ineffective for failing to investigate and use the duct tape evidence in his defense.

## Deficiency

At the outset, we note that contrary to Bradley's assertions, trial counsel did not fail to investigate the duct tape evidence and was not unaware that Mrs. Jones moved about

the house before the police arrived. While counsel did not choose the "independent act" theory as his primary defense, he did make that argument as a "fall-back" defense. Thus, counsel cannot be deemed deficient for failing to investigate the duct tape evidence because competent, substantial evidence supports the trial court's finding that trial counsel did investigate and utilize it at trial.

Moreover, we conclude that counsel's decision to pursue an alibi defense as the primary defense strategy was reasonable under the circumstances. Counsel considered using the independent act theory as his primary defense, but decided the alibi defense was more promising because there was evidence to substantiate it. Only mere speculation supported the theory that Mrs. Jones killed Mr. Jones by striking him with a tool from the garage. There was no evidence that a tire iron was actually kept in Mrs. Jones' car - nor was a tire iron ever found. A fire poker was kept in the living room but there was no evidence presented that it had blood on it. Further, no blood was found on Mrs. Jones or any of her clothing.

Despite postconviction counsel's assertion that the stain found in the teal Buick should have been tested to prove it was a blood stain left there when Mrs. Jones entered the vehicle to obtain the tire iron, postconviction counsel made no attempt to test the stain either. The luminol test's positive result for the stain in the car was not definitive evidence that the substance was indeed blood or, if it was blood, that it was Mr. Jones' blood. The fact that the stain remained uncollected and untested benefit[t]ed Bradley at trial because trial counsel could then suggest to the jury that it was Mr. Jones' blood. Thus, it is clear that trial counsel made a reasonable strategic decision to utilize an alibi defense as the main defense in Bradley's case. See Occhicone,[17] 768 So.2d at 1048 ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."). Accordingly, we conclude that trial counsel was not deficient for choosing to focus on the alibi defense rather than the independent act defense.

---

[17] Occhicone v. State, 768 So.2d 1037 (Fla. 2000) (per curiam).

Prejudice

Even if trial counsel's actions could be considered deficient, we conclude that Bradley has not met the prejudice prong of Strickland.  To meet this prong, the claimant must "establish prejudice [and] 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Williams v. Taylor, 529 U.S. 362, 391, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052).  As set forth below, we conclude that the second prong has not been met.

At the evidentiary hearing on Bradley's postconviction motion, he failed to provide a legal basis to support the claim that pursuing an "independent act" theory as his primary defense at trial would have exonerated him from his role in beating Mr. Jones to death.  Further, Bradley has failed to show that by using the independent act doctrine exclusively, there is a reasonable probability that it would have changed the result of his trial.  Indeed, the independent act doctrine only arises "when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, 'which fall outside of, and are foreign to, the common design of the original collaboration.'" Willacy v. State, 967 So.2d 131, 141 (Fla. 2007) (quoting Ray v. State, 755 So.2d 604, 609 (Fla. 2000)).  Such a defense cannot apply when death was a foreseeable result of the plan.  See Archer v. State, 613 So.2d 446, 448 (Fla. 1993) (holding that the independent act theory is inappropriate when the defendant created the situation and the victim's death was a natural and foreseeable result of forces which the defendant set in motion).

In Bradley's case, even if the intended underlying criminal enterprise was merely to "beat some sense" into Mr. Jones, the beating would clearly be considered a foreseeable force which set in motion the killing.  Further, Bradley knew before he entered the house that he would obtain a firearm there and use it in the crime, which could foreseeably result in death.  See Roberts v. State, 4 So.3d 1261, 1264 (Fla. 5th DCA) (explaining that the independent act theory is inappropriate when the defendant "knew that firearms or deadly weapons would be

35

used"), review dismissed, 14 So.3d 1004 (2009).  Moreover, Bradley's jury was given the independent act instruction and rejected the theory.  While Bradley appears to argue that if trial counsel had focused exclusively on the independent act theory and never raised an alibi defense, Bradley might have fared better, this is mere speculation.  The testimony of the McWhite brothers as well as that of the medical examiner depicts a brutal and methodical beating, resulting in profuse bleeding from the victim's head, broken ribs, a fractured skull, and bruising of the victim's brain and internal organs.  In the middle of the beating, the assailants dragged Mr. Jones to another location in the house and continued to beat him.  Finally, Bradley planned to use a gun in the attack and in fact tried to shoot Mr. Jones by placing the gun to his head and attempting to fire it.  All this evidence contradicts any contention that Bradley's only intent was to "teach Mr. Jones a lesson."  Even without the evidence that Bradley expected a payoff, the methodical, brutal, and continuous nature of the beating evidences a clear intent to kill Mr. Jones.  See, e.g., Taylor v. State, 583 So.2d 323, 329 (Fla. 1991) (finding premeditation where defendant dragged the victim and so severely beat her that ribs were broken and all internal organs and brain were bruised).  As we explained in our decision on direct appeal, there was extensive evidence presented at trial showing Bradley intended to kill Mr. Jones.  Thus, regardless of whether trial counsel had relied on the independent act theory as his primary defense or only as a back-up defense, evidence refuting the notion that Bradley's intent was only to beat and not kill Mr. Jones was substantial and compelling.  We conclude that even if trial counsel was deficient, Bradley has failed to show, pursuant to the second prong of Strickland, that trial counsel's allegedly deficient performance prejudiced him.  Thus, Bradley's first claim is without merit.

Bradley v. State, 33 So.3d at 672-76 (footnotes omitted).

Thus, there is a qualifying decision under AEDPA with respect to this ineffectiveness claim from the Florida Supreme Court.  Upon thorough review of the record and the applicable law, this Court concludes that the Florida Supreme Court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable

36

application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Petitioner is not entitled to relief on this ineffectiveness claim raised in subclaim three of ground one.

## B. Ground Two

Petitioner contends that the trial court erred in finding there was sufficient evidence to support the CCP, HAC and "murder for pecuniary gain" aggravating factors. Petition at 18-24. Petitioner raised his claim regarding the CCP factor on direct appeal, and the Florida Supreme Court adjudicated the claim as follows:

> In issue seven, Bradley argues that the trial court erred during the penalty phase of the case in instructing the jury on and in finding the aggravating circumstance that the crime was committed in a cold, calculated, and premeditated manner (CCP). This Court has held that in order to establish the CCP aggravator:
>
> > [T]he jury must first determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
>
> Woods v. State, 733 So.2d 980, 991 (Fla. 1999) (quoting Gordon v. State, 704 So.2d 107, 114 (Fla. 1997)). This aggravator is of a particularly higher degree and gravity than the premeditation element required to prove first-degree murder. See Jackson v. State, 648 So.2d 85, 89 (Fla. 1994).
>
> Upon review of the evidence we find sufficient competent substantial evidence to allow the issue to go to the jury and

supporting the finding of the CCP aggravator.  As mentioned earlier, the McWhite brothers' testimonies and other evidence strongly point to a carefully arranged plan between Mrs. Jones and Bradley to kill Mr. Jones.  Indeed, there was evidence that Mrs. Jones had unsuccessfully sought to hire another person to kill her husband in the exact manner that Bradley later, in fact, did kill Mr. Jones.  Pursuant to her plan with Bradley, Mrs. Jones made sure to have both her front and side doors unlocked to allow Bradley and the McWhite brothers to enter the home that night. Bradley and the McWhite brothers even knew which path to take in order to avoid the motion-detector lights.  As arranged by Mrs. Jones, Bradley also knew exactly where to find Mr. Jones's gun.  He also told the McWhite brothers to bring the stick with which to beat the victim.

Bradley also argues that there can be no CCP since he only intended to beat Mr. Jones.  Once again, as discussed earlier, the brutal and methodical nature of the beating itself and the additional use of a gun indicates an intent to kill.  <u>See Heiney</u>,[18] 447 So.2d at 214.  It seems that if Bradley only intended to intimidate the victim, that could have been accomplished well before he landed the fatal blows to the head or attempted to shoot the victim point-blank.  He could have stopped, for instance, after the first round of the beating when he tied the victim's hands and legs.  Additionally, after the murder he told one of the McWhite brothers that he was expecting between $100,000 and $200,000 from Mrs. Jones. This seems to be an inordinately huge amount of money for a simple beating.  Thus, this theory does not seem to be reasonable with regard to CCP.FN13.

> FN13. Bradley also argues that there is a possibility that Mr. Jones did not die immediately and Mrs. Jones finished him off after Bradley left. The only evidence he provided in support of this contention is that there is some indication that Mrs. Jones took a shower after Bradley left her home.  He also contends that Mr. Jones had a head injury which was not consistent with the

---

[18] <u>Heiney v. State</u>, 447 So.2d 210 (Fla. 1984) (per curiam).

impact of the stick.  The jury properly rejected this hypothesis.  See Woods, 733 So.2d at 986.

We conclude that these circumstances considered together support the finding of CCP.  See Bell v. State, 699 So.2d 674, 677 (Fla. 1997) ("Cold, calculated, premeditated murder can be indicated by the circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.") (citing Swafford v. State, 533 So.2d 270, 277 (Fla. 1988)).

Bradley v. State, 787 So.2d at 744-45 (two footnotes omitted).

Thus, there is a qualifying decision under AEDPA with respect to this claim from the Florida Supreme Court.  Upon thorough review of the record and the applicable law, this Court concludes that the Florida Supreme Court's adjudication of this claim was not contrary to clearly established federal law,[19] did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Accordingly, Petitioner is not entitled to relief on this portion of his claim raised in ground two.

Petitioner is also not entitled to relief on the remaining portions of this claim because they are procedurally barred.  Respondents contend, and this Court agrees, that Petitioner

---

[19] See Lewis v. Jeffers, 497 U.S. 764, 780-81 ("in determining whether a state court's application of its constitutionally adequate aggravating circumstance was so erroneous as to raise an independent due process or Eighth Amendment violation, we think the . . . appropriate standard of review is the 'rational factfinder' standard established in Jackson v. Virginia"); Jackson v. Virginia, 443 U.S. 307, 319 (1979) (holding that where a federal habeas corpus claimant alleges that his state conviction is unsupported by the evidence, federal courts must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").  Petitioner has not met this standard.

never argued in state court that the trial court erred in finding there was sufficient evidence to support the HAC and "murder for pecuniary gain" aggravating factors.  <u>See</u> Response at 18, 22, 88-89, 93-94.   Therefore, the trial court and the Florida Supreme Court never addressed these claims and these portions of ground two have not been exhausted.

A petition for writ of habeas corpus should not be entertained unless the petitioner has first exhausted his state remedies.  <u>See</u>  <u>Castille v. Peoples</u>, 489 U.S. 346, 349, <u>reh'g denied</u>, 490 U.S. 1076 (1989); <u>Rose v. Lundy</u>, 455 U.S. 509 (1982).

> Exhaustion requires that "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); <u>see</u> § 2254(b), (c). That is, to properly exhaust a claim, the petitioner must "fairly present[ ]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. <u>Castille v. Peoples</u>, 489 U.S. 346, 350-51, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989) (quotation omitted).

<u>Powell v. Allen</u>, 602 F.3d 1263, 1269 (11th Cir. 2010) (per curiam).

A procedural default  arises "when 'the petitioner fails to raise the [federal] claim in state court and it is clear from state law that any future attempts at exhaustion would be futile.'"  <u>Owen v. Sec'y, Dep't of Corr.</u>, 568 F.3d 894, 908 n.9 (11th Cir. 2009) (quoting <u>Zeigler v. Crosby</u>, 345 F.3d 1300, 1304 (11th Cir. 2003)).  Here, it would be futile to dismiss this case to give Petitioner the opportunity to exhaust these portions of his claim under ground two because they could have and should have been raised on direct appeal. Accordingly, these portions of ground two have been procedurally defaulted.

"The doctrine barring procedurally defaulted claims from being heard is not without exceptions.  A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law."  Martinez v. Ryan, 132 S.Ct. 1309, 1316 (2012) (citing Coleman v. Thompson, 501 U.S. 722, 750 (1991)).

> For purposes of the "cause and prejudice" method of overcoming a procedural bar, a petitioner shows sufficient cause if he can demonstrate "that some 'objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'"  Siebert,[20] 455 F.3d at 1272 (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)).  External impediments sufficient to constitute cause "include evidence that could not reasonably have been discovered in time to comply with the rule; interference by state officials that made compliance impossible; and ineffective assistance of counsel at a stage where the petitioner had a right to counsel."  Mize,[21] 532 F.3d at 1190.

Owen, 568 F.3d at 908.  Once cause has been established, a petitioner must also demonstrate prejudice.  "As to the prejudice requirement, the petitioner must show 'that there is at least a reasonable probability that the result of the proceeding would have been different had the constitutional violation not occurred.'"  Id. (quoting Mize v. Hall, 532 F.3d 1184, 1190 (11th Cir. 2008)).

A petitioner may also obtain review of the merits of a procedurally barred claim if he satisfies the actual innocence "gateway" established in Schlup v. Delo, 513 U.S. 298 (1995).

> The "Schlup gateway" allows a petitioner sentenced to death to "raise[] a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his

---

[20] Siebert v. Allen, 455 F.3d 1269 (11th Cir. 2006).

[21] Mize v. Hall, 532 F.3d 1184 (11th Cir. 2008).

41

constitutional claims." Id. at 867.  The "Schlup gateway" is meant to prevent a constitutional error at trial from causing a "miscarriage of justice" and "the conviction of one who is actually innocent[.]" Id. at 865.

To meet the proper standard, "the petitioner must show that it is *more likely than not* that *no reasonable juror* would have convicted him in the light of the new evidence." Id. at 867 (emphasis added).  This showing is more than that showing required to establish prejudice.  Id.  The Supreme Court in Schlup said this about the needed evidence: "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 865.  In reviewing this evidence, courts are not bound by the usual rules of admissibility that would govern at a trial; and guilt is considered "with reference to a reasonable doubt." Id. at 867.  "[A] petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Id.

Kuenzel v. Comm'r, Ala. Dep't of Corr., 690 F.3d 1311, 1314-15 (11th Cir. 2012) (per curiam).

In this case, Petitioner has not alleged, let alone shown, either cause excusing the default or actual prejudice resulting from the bar.  Furthermore, he has neither claimed nor shown that he is entitled to the fundamental miscarriage of justice exception.  Thus, the Court will not reach the merits of Petitioner's unexhausted claims in ground two (that the trial court erred in finding there was sufficient evidence to support the HAC and "murder for pecuniary gain" aggravating factors) because they are procedurally barred.

## C. Ground Three

Petitioner claims that the trial court erred in finding there was sufficient evidence to support the charge of conspiracy to commit first degree murder.  Petition at 25.[22]  Petitioner raised this claim on direct appeal, and the Florida Supreme Court adjudicated the claim as follows:

> In issue four, much as in issue one, Bradley argues the State failed to establish beyond a reasonable doubt that Bradley and Mrs. Jones conspired to kill Mr. Jones.  Therefore, he contends, his conviction for conspiracy must be vacated.
>
> The crime of conspiracy is defined as an agreement, express or implied, between two or more people to commit an unlawful act.  See Robinson v. State, 610 So.2d 1288 (Fla. 1992); see generally § 777.03(3), Fla. Stat. (1995) (conspiracy statute); § 782.04, Fla. Stat. (1995) (murder statute). Conspiracy can be proven by circumstantial evidence and thus a jury may infer that an agreement existed to commit a crime from all the surrounding and accompanying circumstances. See Robinson, 610 So.2d at 1289.
>
> As earlier discussed, sufficient evidence exists for the finding of premeditation on Bradley's part for the killing of Mr. Jones.  Similarly, we conclude the evidence is sufficient for the finding of conspiracy, that is, an agreement between Mrs. Jones and Bradley to kill Mr. Jones.  As previously discussed and established by Janice Cole's testimony, Mrs. Jones's frustration with her husband's affair had reached a boiling point in the days leading to the murder, and she wanted him killed perhaps more than ever.  In addition to this testimony and the evidence of coordination between Bradley and Mrs. Jones around the time of the murder, Bradley himself, in an attempt to convince the McWhite brothers to keep quiet, told them that he was expecting a payoff from Mrs. Jones as soon as she collected from the insurance companies.

---

[22] Petitioner also argues in this ground that the death penalty is disproportionate.  That portion of his claim will be addressed in the discussion of ground five.

> In light of these circumstances, Bradley's hypothesis of innocence with regard to conspiracy to murder Mr. Jones is not reasonable here.  See State v. Spioch, 706 So.2d 32, 34-35 (Fla. 5th DCA 1998) (circumstantial evidence standard was met where evidence of motive, payment to the coconspirator, and unsatisfactory explanation for the payment was introduced).

Bradley v. State, 787 So.2d at 740-41.

Thus, there is a qualifying decision under AEDPA with respect to this claim from the Florida Supreme Court.  Upon thorough review of the record and the applicable law, this Court concludes that the Florida Supreme Court's adjudication of this claim was not contrary to clearly established federal law,[23] did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Petitioner is not entitled to relief on ground three.

### D. Ground Four

Petitioner entitles this ground as follows:

> TRIAL JURY'S LIMITED CONSIDERATION OF MITIGATING CIRCUMSTANCES VIOLATES PETITIONER'S EIGHTH

---

[23] Insofar as Petitioner argues that none of the evidence presented "conflicts with the defense theory that this was a planned beating gone awry," Petition at 18, the Court notes that the requirement under Florida law--that the circumstantial evidence must be inconsistent with any reasonable hypothesis of innocence--is not mandated by federal law.  In fact, the opposite is true.  "The Court need not exclude every reasonable hypothesis of innocence or find guilt to be the only reasonable conclusion." United States v. Garcia, 13 F.3d 1464, 1473 (11th Cir. 1994) (citing United States v. Kelly, 888 F.2d 732, 740 (11th Cir. 1989)). See also Johnson v. Alabama, 256 F.3d 1156, 1172 (11th Cir. 2001) (noting that, although each element of the offense must be established beyond a reasonable doubt, the state is not required to rule out every hypothesis except that of the guilt of the defendant) (citing Jackson v. Virginia, 443 U.S. 307, 326 (1979), and Martin v. Alabama, 730 F.2d 721, 724 (11th Cir. 1984)).

AMENDMENT RIGHT TO A RELIABLE PENALTY HEARING FREE FROM CRUEL AND UNUSUAL PUNISHMENT AND FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS OF LAW.

Petition at 26. However, the allegations in support of ground four do not relate to the above-quoted title and instead raise a conglomeration of issues that this Court will address seriatim.

First, Petitioner alleges that the State failed to prove beyond any reasonable doubt that Linda Jones and Petitioner conspired to kill Jack Jones "because the evidence was equally consistent with an agreement only to beat him up." Id. As noted above in the discussion of ground three, federal law, unlike Florida law, does not require that the circumstantial evidence be inconsistent with any reasonable hypothesis of innocence. And, as found by the Florida Supreme Court, there was sufficient evidence presented by the State to prove the charge of conspiracy to commit murder. This Court will not revisit this issue.

Next, Petitioner argues that "the evidence did not prove that murder was premeditated." Id. The Florida Supreme Court addressed and rejected this claim when it was raised on direct appeal, stating in pertinent part:

> In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt. See Banks v. State, 732 So.2d 1065, 1067 n.5 (Fla. 1999).

> Bradley first asserts a lack of evidence of premeditation. This Court has recently reiterated the definition of premeditation in Woods v. State, 733 So.2d 980, 985 (Fla. 1999):

>> Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment

45

before the act but must exist for a sufficient length
of time to permit reflection as to the nature of the
act to be committed and the probable result of that
act.

Id.; see also Buckner v. State, 714 So.2d 384, 387 (Fla. 1998)
("Premeditation need only exist for such time as will allow the
accused to be conscious of the nature of the act the accused is
about to commit and the probable result of the act."),
Importantly, however, premeditation may be established by
circumstantial evidence. See Norton v. State, 709 So.2d 87, 92
(Fla. 1997). A trier of fact may therefore infer premeditation
from factors such as "the nature of the weapon used, the
presence or absence of adequate provocation, previous
difficulties between the parties, the manner in which the
homicide was committed, and the nature and manner of the
wounds inflicted." Id.

Upon review of the record, and taking the inferences
most favorable to the State, we conclude that the evidence was
sufficient to support a finding of premeditation by Bradley. In
essence, the State's theory was that Mrs. Jones had two strong
motives for wanting to kill her husband, first, her anger about Mr.
Jones's affair, and second, her desire to collect the substantial
proceeds of Mr. Jones's life insurance policies; and she was
able to convince Bradley to kill Mr. Jones to carry out her
wishes.

The State's evidence included: the testimony of Janice
Cole to whom Mrs. Jones suggested her desire to kill Mr. Jones
and to receive his life insurance benefits;FN7 the testimony of
the McWhite brothers and Clark concerning the October 31
incident in which Bradley attempted to retrieve the ring from the
teenager and their subsequent vandalism of the teenager's car
that night; phone records showing numerous communications
between Bradley and Mrs. Jones on October 31, 1995,
November 7, 1995 (the day of the murder), and January 22,
1996 (the day the authorities served a warrant on Bradley); the
testimonies of the McWhite brothers of their participation in this
act and direct witnessing of Bradley's brutal and fatal beating of
Mr. Jones; Bradley's failed attempt at shooting the victim at
point-blank range; and the testimony of Brian McWhite regarding

46

Bradley's admission that he was expecting an enormous payoff from Mrs. Jones in a sum ranging from $100,000 to $200,000.

> FN7. The relevant examination of Ms. Cole reflects:
>
> Q.  What did she [Ms. Jones] tell you?
>
> A.  She told me that she was real upset with the situation and everything that she had been through.  That she knew at this point that she could just take a gun and kill Jack and get away with it because of the issues that had come up and she was so upset with him.
>
> . . . .
>
> Q.  Okay.  Did she give you any other reason why she could not get a divorce with Jack?
>
> A.  She said that if she got a divorce from Jack that his new wife would get his life insurance.  And she told me, and I thought that the figure was $500,000 at the time, if they got a divorce that she would not be able to get that life insurance.  And that was one of the main things, that she was not going to fat and forty and alone.
>
> Record on Appeal at 1434–36.

Importantly, we note that the nature of the assault and battery, when combined with the additional evidence of premeditation here, is quite telling.  See Heiney v. State, 447 So.2d 210, 214 (Fla. 1984) ("Evidence from which premeditation may be inferred include the manner in which the homicide was committed and the nature and manner of the wounds.").  Both the testimonies of the McWhite brothers and that of the medical examiner depict a brutal and methodical beating, resulting in profuse bleeding from the victim's head, broken ribs, a fractured skull, and bruising of the victim's brain, lungs, and other internal organs.  In the middle of the beating, Bradley and the McWhite brothers taped up the victim's hands and legs, dragged him to another room, and continued the beating.  See Taylor v. State,

47

583 So.2d 323, 329 (Fla. 1991) (finding premeditation where defendant dragged the victim and so severely beat him that his ribs were broken and internal organs were either torn or bruised).  Despite Bradley's argument to the contrary, this type of beating with its patent consequence of death, along with all the other evidence, is consistent with premeditation.  See id.

Bradley contends that the beating only indicates an intent to beat the victim up and scare some sense into him.  As the McWhite brothers testified, however, Bradley not only continued to beat the victim to death, but he also attempted to shoot the victim in the head, an act most would agree would ordinarily contemplate death as a consequence.  Bradley also points to the testimonies of the McWhite brothers that they themselves believed that they were going there to beat someone up.  While it may be true that the McWhite brothers believed so, and were persuaded to participate on that basis, that does not lessen Bradley's responsibility for his own actions in brutally beating the victim to death and attempting to shoot him with his own gun.  In addition, he admitted to the McWhite brothers that he indeed was expecting a huge amount of money from Mrs. Jones for his actions, again an expectation reasonably predicated upon Mrs. Jones's receipt of life insurance proceeds that could only come from the death of Mr. Jones.

We find the trial court properly denied Bradley's motion for judgment of acquittal as the State presented sufficient evidence from which the jury could infer premeditation to the exclusion of all other inferences.  See Woods, 733 So.2d at 984.FN8

FN8. It should be noted that Bradley's position at trial was that he did not commit the crime, but was at his home watching television instead.

Bradley v. State, 787 So.2d at 738-40.

Thus, there is a qualifying decision under AEDPA with respect to this sufficiency of

the evidence claim from the Florida Supreme Court.  Upon thorough review of the record

and the applicable law, this Court concludes that the Florida Supreme Court's adjudication

48

of this claim was not contrary to clearly established federal law,[24] did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Accordingly, Petitioner is not entitled to relief on this portion of ground four.

Next, Petitioner argues the following:

> The evidence left open the reasonable probability that Bradley went into a frenzy and killed Jack Jones without intending to do so, or that Linda Jones killed her husband after Bradley left.[25] Thus, the cold, calculated, and premeditated and especially heinous, atrocious or cruel (HAC) aggravator[s are] inapplicable to Bradley. Further there was no conclusive evidence that [the] murder was for pecuniary gain as argued in Claim II above. Since the State's evidence failed to prove the aggravators beyond any reasonable doubt, it was error for the trial court to instruct the jury on this and to consider this aggravator as a reason for imposing the death sentence.

Petition at 26.

The applicability and appropriateness of the CCP factor was addressed in the discussion of ground two.  Additionally, the challenges to the HAC and "murder for pecuniary

---

[24] "Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), provides the federal due process benchmark for evidentiary sufficiency in criminal cases.  See Green v. Nelson, 595 F.3d 1245, 1252-53 (11th Cir. 2010).  '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' Jackson, 99 S.Ct. at 2789."  Williams v. Sec'y, Dep't of Corr., 395 F. App'x 524, 525 (11th Cir. 2010) (per curiam).

[25] Count one of the indictment charged that Petitioner "unlawfully and from a premeditated design to effect the death of Jack Jones, or during the commission of, attempt to commit, or escape from the immediate scene of a Burglary With a Dangerous Weapon, did then and there kill Jack Jones, a human being, by beating him to death."  Ex. 1 at 7.  The jury found Petitioner guilty as charged, see Ex. 20; therefore, the jury obviously rejected any evidence that the victim was killed by his wife after Petitioner left the scene.

gain" aggravating factors are procedurally barred for the reasons stated in the discussion of ground two.  Accordingly, the challenges to these three aggravating factors will not be addressed again in this ground.

Petitioner's final argument in this ground is as follows:

> [I]n the present case, the murder was unaccompanied by any motivation, such as pecuniary gain, and without the aggravating circumstance of a prior violent felony.  Further, defendant's mental illness undoubtably contributed to the crime. The murder was not among the most aggravated and unmitigated of most serious crimes for which the ultimate penalty of death is warranted for Donald Bradley.  Imposition of the death penalty would thus be disproportionate punishment. Life in prison is the appropriate punishment for Bradley.

Id. at 27.

Once again, the issue regarding the pecuniary gain aggravating factor is procedurally barred.  The remaining issue of whether the death penalty is disproportionate will be addressed in the discussion of ground five.  Finally, insofar as Petitioner may be attempting to raise some sort of cumulative error claim in this ground, such a claim is both procedurally barred and without merit.  See Response at 98-100.

## E. Ground Five

Petitioner contends that his sentence of death is disproportionate under both state and federal law.  Petitioner argues that "[i]f this Court accepts petitioner's argument that Bradley killed the victim unintentionally during a felony, then the death penalty is disproportionate because it is neither the most aggravated nor the least mitigated of first degree murders.  In the alternative, if this Court finds the evidence of premeditation

sufficient, the death penalty is disproportionate because Linda Jones, who was equally culpable, received life." Petition at 30.

Insofar as Petitioner contends that his death sentence is disproportionate under the laws or constitution of Florida, he has presented an issue of state law that is not cognizable under federal habeas review. Moreover, a proportionality review is not required under federal law. See Response at 101.

In any event, the Florida Supreme Court addressed and rejected Petitioner's proportionality claim when it was raised on direct appeal, stating in pertinent part:

> In issue eight, Bradley challenges the proportionality of his death sentence. Due to the uniqueness and the finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990). In conducting this review, this Court makes a comprehensive analysis in which it determines whether the crime falls within the category of both the most aggravated and the least mitigated of murders, see Cooper v. State, 739 So.2d 82, 85 (Fla. 1999), thereby providing for uniformity in the application of the sentence. See Urbin v. State, 714 So.2d 411, 416-17 (Fla. 1998). Proportionality review, however, is more than a mere quantitative comparison between the number of aggravating and mitigating circumstances. See Bates v. State, 750 So.2d 6 (Fla. 1999), cert. denied, 531 U.S. 835, 121 S.Ct. 93, 148 L.Ed.2d 53 (2000). Rather, it is a review of the totality of all the circumstances in a case as compared to other cases in which the death penalty had been imposed. See Robinson v. State, 761 So.2d 269 (Fla. 1999), cert. denied, 529 U.S. 1057, 120 S.Ct. 1563, 146 L.Ed.2d 466 (2000).
>
> The court here found four aggravating circumstances: (1) the capital felony was especially heinous, atrocious or cruel (HAC); (2) CCP; (3) the capital felony was committed for pecuniary gain; and (4) the capital felony was committed while engaged in the commission of the crime of burglary. As to the statutory mitigating circumstances, the court found but gave very little weight to the two statutory mitigating circumstances: (1) the

defendant had no significant history of prior criminal activity; and (2) the age of the defendant at the time of the crime (thirty-six). The trial court also found and gave "some weight" to certain nonstatutory mitigating circumstances: Bradley overcame a chaotic childhood and dysfunctional family life to make real achievements in his own life, including establishing loving relationships in his family and reestablishing a relationship with his father; he had been a good provider and father for his present wife and his children, loves his family, and is loved by them; he has maintained a good employment record; he was helpful to other people inside and outside of his family; and he has shown sincere religious faith.

We conclude that the death sentence in this case is proportionate to those other cases involving many similar circumstances where we have approved death. See McDonald v. State, 743 So.2d 501, 507 (Fla. 1999) (affirming the death sentence where evidence established four aggravating circumstances of commission during a robbery/burglary, HAC, CCP, and pecuniary gain, and three nonstatutory mitigators of the defendant's good prison behavior, his advanced age at the time of eligibility for parole, and codefendant's lighter life sentence); Gordon v. State, 704 So.2d 107, 117 (Fla. 1997) (finding sentence proportionate where evidence established four aggravating circumstances of commission during a burglary, pecuniary gain, HAC, and CCP, and very little in mitigation). We have even affirmed death sentences in other cases with less aggravation than the current case. See Sliney v. State, 699 So.2d 662 (Fla. 1997) (finding the death penalty proportionate with the existence of two aggravating circumstances of commission during a robbery and to avoid arrest, two statutory mitigators (age and lack of criminal history), and a number of nonstatutory mitigators); Hayes v. State, 581 So.2d 121 (Fla. 1991) (affirming the death penalty where evidence established two aggravating circumstances of CCP and commission during a robbery, one statutory mitigator (age), and other nonstatutory mitigators).

Bradley's main contention is that the lighter sentence of Mrs. Jones renders his sentence disproportionate. This Court has held on numerous occasions that the relative culpability of a codefendant and the sentence imposed on such codefendant are appropriate and important factors in considering whether to

impose or approve a death sentence. <u>See</u>, <u>e.g.</u>, <u>Howell v. State</u>, 707 So.2d 674, 682 (Fla. 1998).  However, this Court has also found with some limited exceptions that the defendant who actually plans and kills the victim is charged with a high level of culpability and his codefendants' lesser sentences will not necessarily render his death sentence disproportionate.  <u>See</u> <u>Sliney v. State</u>, 699 So.2d 662, 672 (Fla. 1997).

We agree that the record reveals that Mrs. Jones did in fact plan this murder and was the originator of the idea of killing her husband.  That is evidenced by the fact that she had contacted two other individuals to commit this murder. However, the evidence is also consistent with some level of participation in this planning on Bradley's part as well, as shown by the evidence of premeditation and conspiracy between the two.  The record also establishes that Bradley, with the help of the McWhite brothers and not Mrs. Jones, actually carried out this brutal beating of the victim.

We acknowledge evidence that Mrs. Jones initiated the scheme to kill and sat and watched approvingly.  However, in addition to Bradley's culpability as the actual killer and his participation in the planning, a review of Mrs. Jones's penalty phase proceeding also distinguishes her case from Bradley's and reveals possible reasons why her life was spared.  In Mrs. Jones's case, though the State sought and argued for death, the State only asserted the existence of two aggravators (pecuniary gain and CCP).  In addition, defense counsel argued that Mrs. Jones was under extreme emotional pressure because of the betrayal by her husband and by his teenage lover, who, despite being treated like a daughter by Mrs. Jones, proceeded to betray this kindness by having an affair with Mr. Jones. Counsel also highlighted Mr. Jones's blatant disrespect for his wife in flaunting his affair, which, he argued, also contributed to Mrs. Jones's emotional breakdown.  That argument may well have resonated with the jury, resulting in a life recommendation for Mrs. Jones.

In contrast to this evidence of mental mitigation for Mrs. Jones, the evidence reveals no such emotional investment and subsequent emotional devastation on the part of Bradley. Rather, Bradley seems to have strictly been motivated by an expected monetary payoff.  Considering all these

53

> circumstances, we conclude the sentence is not disproportionate. <u>See</u> <u>McDonald</u>, 743 So.2d at 506-07 (finding that codefendant's life sentence did not render death sentence disproportionate where codefendant hired defendant to kill her husband); <u>Gordon</u>, 704 So.2d at 117 (same).

<u>Bradley v. State</u>, 787 So.2d at 745-47 (footnotes omitted).

Thus, there is a qualifying decision under AEDPA with respect to this claim from the Florida Supreme Court. Upon thorough review of the record and the applicable law, this Court concludes that the Florida Supreme Court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law,[26] and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, Petitioner is not entitled to relief on ground five.

## VI. Certificate of Appealability

This Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make

---

[26] The Supreme Court has not recognized a federal constitutional right to a sentence proportionate to one's co-defendant. <u>See</u> <u>Pulley v. Harris</u>, 465 U.S. 37, 43-44 (1984) (rejecting the argument that the Constitution demands a comparative proportionality review that "purports to inquire . . . whether the penalty is . . . unacceptable in a particular case because [it is] disproportionate to the punishment imposed on others convicted of the same crime[,]" and holding that a federal habeas petitioner was not constitutionally entitled to a proportionality review that would compare his sentence "with the penalties imposed in similar cases"). Thus, if a petitioner requests a federal habeas court to conduct a proportionality review, the Eleventh Circuit has "instructed district courts to refuse such requests when deciding habeas corpus petitions." <u>Mills v. Singletary</u>, 161 F.3d 1273, 1282 (11th Cir. 1998) (per curiam); <u>see also</u> <u>Bush v. Singletary</u>, 99 F.3d 373, 375 (11th Cir. 1996) (per curiam) (noting that a proportionality review is not required by the federal constitution, but only by Florida law, and a federal court may not issue the writ on the basis of a perceived error of state law).

this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 335-36 (2003) (quoting <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. <u>See</u> <u>Slack</u>, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Id</u>. Though this is a capital case, which requires special consideration, upon review of the record as a whole, this Court will nevertheless deny a certificate of appealability because the Court does not see an appellate issue that qualifies under the <u>Slack</u> standard.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.      The Petition (Doc. #1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.      The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

55

3.      If Petitioner appeals the denial of the Petition, the Court denies a certificate of appealability.

4.      Because this Court has determined that a certificate of appealability is not warranted, the **Clerk of the Court** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case.  Such termination shall serve as a denial of the motion.

5.      The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida this 12th day of March, 2014.

TIMOTHY J. CORRIGAN
United States District Judge

ps 1/28
c:
Counsel of Record